UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**FILED**

NOV 22 2023

JUDGE MATTHEW F. KENNELLY
UNITED STATES DISTRICT COURT

| | |
|---|---|
| UNITED STATES OF AMERICA | No. 22 CR 208 |
| v. | |
| JOSEPH J. CIPOLLA, JR. | Judge Matthew F. Kennelly |

## PLEA AGREEMENT

1.     This Plea Agreement between the Acting United States Attorney for the Northern District of Illinois, MORRIS PASQUAL, and defendant JOSEPH J. CIPOLLA, JR., and his attorney, JACK CORFMAN, is made pursuant to Rule 11 of the Federal Rules of Criminal Procedure and is governed in part by Rule 11(c)(1)(A), as more fully set forth below. The parties to this Agreement have agreed upon the following:

### Charges in This Case

2.     The superseding indictment in this case charges defendant with tax evasion, in violation of Title 26, United States Code, Section 7201 (Counts 1, 3, 5, 7, 9, 11), the willful non-filing of individual income tax returns, in violation of Title 26, United States Code, Section 7203 (Counts 2, 4, 6, 8, 10, 12), wire fraud, in violation of Title 18, United States Code, Section 1343 (Counts 13-19, 21, 24), bank fraud, in violation of Title 18, United States Code, Section 1344 (Count 20), mail fraud, in violation of Title 18, United States Code, Section 1341 (Count 22), and odometer rollback fraud, in violation of Title 49, United States Code, Sections 32703(2) and 32709(b) (Count 23).

3.    Defendant has read the charges against him contained in the superseding indictment, and those charges have been fully explained to him by his attorney.

4.    Defendant fully understands the nature and elements of the crimes with which he has been charged.

## Charges to Which Defendant Is Pleading Guilty

5.    By this Plea Agreement, defendant agrees to enter a voluntary plea of guilty to the following counts of the superseding indictment: Count 11, which charges defendant with tax evasion, in violation Title 26, United States Code, Section 7201; Count 13, which charges defendant with wire fraud, in violation of Title 18, United States Code, Section 1343; Count 22, which charges defendant with mail fraud, in violation of Title 18, United States Code, Section 1341; and Count 24, which charges defendant with wire fraud, in violation of Title 18, United States Code, Section 1343. As further provided below, defendant also agrees to the entry of a forfeiture judgment.

## Factual Basis

6.    Defendant will plead guilty because he is in fact guilty of the charges contained in Counts 11, 13, 22 and 24 of the superseding indictment. In pleading guilty, defendant admits the following facts and that those facts establish his guilt beyond a reasonable doubt and constitute relevant conduct pursuant to Guideline § 1B1.3, and establish a basis for the issuance of a personal money judgment as described elsewhere in this Plea Agreement:

2

a.  With respect to Count 11 of the superseding indictment:

During calendar year 2020, and continuing thereafter until October 12, 2022, in the Northern District of Illinois, Eastern Division, JOSEPH J. CIPOLI,A, JR., defendant herein, did willfully attempt to evade and defeat the federal income tax due and owing by him to the United States for the calendar year 2020 by committing the following affirmative acts, among others: (a) maintaining a false registered agent for service of process in Illinois for Six North Aviation; (b) renting hangars 99-1 and 2 at the DuPage County Airport through a nominee lessee; (c) using a nominee to act as titleholder for his BMW; and (d) handling his affairs in a manner so as to avoid the creation and maintenance of customary business and accounting records concerning actual revenues received and expenses incurred; in violation of Title 26, United States Code, Section 7201.

Specifically, during calendar years 2015 through 2020, defendant CIPOLLA obtained taxable income from the operation of businesses he operated and/or controlled, including: Company A; Chicago Muscle Cars LLC ("Chicago Muscle Cars"); Mercedes Benz Classics LLC ("Mercedes Benz Classics"); Six North Aviation LLC ("Six North Aviation"); Exotic Aerospace LLC ("Exotic Aerospace")Chicago Exotic Car Collection LLC ("Chicago Exotic Car Collection"); and Dupage Aviation LLC ("Dupage Aviation"), a single member Illinois limited liability company. CIPOLLA used the funds for his personal benefit and failed to report his receipt of this income in the federal and state tax returns he filed for those years. CIPOLLA's

businesses were single member limited liability companies, and as such, CIPOLLA was required on an annual basis to file with the IRS, a Form 1040 United States Individual Income Tax Return ("Form 1040") that, among other things, reported the income he received that year as well as reporting the sales and income of his limited liability companies. Despite knowing this, CIPOLLA willfully failed to file any Form 1040 tax returns with the IRS for 2015 through 2020, and in each year willfully attempted to conceal his receipt of income and evade the tax due and owing by committing acts of evasion.

During calendar year 2020, CIPOLLA received net business income of at least $1,177,097, which included the proceeds of Paycheck Protection Program loans and an Economic Injury Disaster Loan that CIPOLLA procured through fraud, as further described below with respect to Count 13. As CIPOLLA knew at the time, he was obligated to pay an income tax liability to the IRS based on his receipt of personal and business income in 2020, including on the fraudulently procured Paycheck Protection Program loans and Economic Injury Disaster Loan funds. In order to evade his tax liability, CIPOLLA intentionally failed to file a Form 1040 for 2020 and committed multiple acts of evasion. CIPOLLA's acts of invasion included the following: (a) CIPOLLA maintained a false registered agent for service of process of Six North Aviation; (b) CIPOLLA used a nominee to rent aircraft hangars at the DuPage County Airport that he used to operate his businesses Six North Aviation and Dupage Aviation; (c) CIPOLLA used a nominee to hold title to and register a

4

BMW automobile that CIPOLLA personally owned, used, and controlled; and (d) CIPOLLA handled his business affairs in a manner so as to avoid the creation and maintenance of customary business and accounting records concerning actual revenues received and expenses incurred. For the 2020 tax year, CIPOLLA's conduct resulted in a federal income tax loss of approximately $363,499, a state tax loss of approximately $58,036, and a total tax loss of approximately $421,535.

With respect to tax years 2015 through 2019, CIPOLLA likewise failed to file Form 1040 tax returns with the IRS and engaged in further affirmative acts of evasion in an effort to evade and defeat the federal tax due and owing by him to the IRS. The affirmative acts of evasion varied over the years and, in addition to those described above, at times included the following: (a) using a family member's social security number at Casino A so that any winnings CIPOLLA received would be reported by Casino A to the IRS and associated with CIPOLLA's relative; (b) using a relative as a nominee tenant of an apartment in downtown Chicago that CIPOLLA rented to third parties using an online short-term rental service; (c) using relatives as nominee owners for the purchase and resale of motor vehicles for profit; and (d) purchasing a Cessna aircraft using a false name. In each of these years, CIPOLLA also handled his personal and business affairs, including those of his various companies, in a manner so as to avoid the creation and maintenance of customary business and accounting records concerning actual revenues received and expenses incurred. For each of these tax years, the total tax loss is approximately the following:

| Tax Year | Federal Tax Loss | State Tax Loss | Total Tax Loss |
|----------|-----------------|----------------|----------------|
| 2015 | $8,975 | $2,284 | $11,259 |
| 2016 | $17,490 | $3,564 | $21,054 |
| 2017 | $4,098 | $1,682 | $5,780 |
| 2018 | $10,729 | $4,790 | $15,519 |
| 2019 | $10,252 | $4,689 | $14,941 |

Therefore, based upon the foregoing, the total tax loss for tax years 2015 through 2020 is $490,088, which is the sum of the federal tax loss ($415,043) and state tax loss ($75,045).

      b.     With respect to Count 13 of the superseding indictment:

Beginning no later than in or about April 2020, and continuing until at least June 2, 2020, in the Northern District of Illinois, Eastern Division, and elsewhere, CIPOLLA knowingly devised, intended to devise, and participated in a scheme to defraud, and to obtain money and property, namely, Paycheck Protection Program ("PPP") and Economic Injury Disaster Loan ("EIDL") funds, by means of materially false and fraudulent pretenses, representations, and promises, and the concealment of material facts; and on or about April 9, 2020, for the purpose of executing the

scheme, CIPOLLA knowingly caused to be transmitted by means of wire communication in interstate commerce certain writings, signs, and signals, namely, an application for a PPP loan from Bank A to Six North Aviation in the amount of $450,000, which application was processed by Bank A servers outside of the State of Illinois, in violation of Title 18, United States Code, Section 1343.

CIPOLLA acknowledges that the Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law enacted in March 2020 and designed to provide emergency financial assistance to the millions of Americans who were suffering the economic effects caused by the COVID-19 pandemic. CIPOLLA further acknowledges that one source of relief provided by the CARES Act was the authorization of up to $349 billion in forgivable loans to small businesses and sole proprietorships for job retention and certain other expenses, through a program implemented by the U.S. Small Business Administration ("SBA"), namely, the PPP.

CIPOLLA knew that, to obtain a PPP loan, a business was required to submit and sign a PPP loan application, in which the applicant was required to certify that it had a business in operation on or before February 15, 2020, that economic uncertainty at the time of the application made the loan request necessary to support the business's ongoing operations, and that loan proceeds would be used by the business only for certain permissible expenses, namely, payroll costs, interest on mortgages, rent, and utilities. CIPOLLA knew that, among other data, businesses applying for a PPP loan had to disclose in the application the number of individuals

it employed and its average monthly payroll. CIPOLLA acknowledges that information about the PPP applicants' business employees and payroll was material to the lenders' approval, terms, and funding of PPP loans.

CIPOLLA further acknowledges that another source of relief provided by the CARES Act was the expansion of the EIDL program, which provided loan assistance (including advances of up to $10,000) for businesses with, among other things, 500 or fewer employees and other eligible entities. CIPOLLA acknowledges the EIDL program was designed to provide economic relief to small businesses that were experiencing a temporary loss of revenue.

CIPOLLLA knew that, to gain access to funds through the EIDL Program, small businesses applied through the SBA via an online portal and application. CIPOLLA knew that the SBA required applicants to submit truthful information about the applying entity, its owner, and its condition prior to the COVID-19 pandemic, including the entity's number of employees as of January 31, 2020; the entity's gross revenues and cost of goods sold for the 12-month period prior to January 31, 2020; the entity's type of business; and the date on which the current owner assumed ownership of the entity. CIPOLLA understood that applicants who received EIDL proceeds were required to use those proceeds to pay an array of working capital and normal operating expenses, such as continuation of health care benefits, rent, utilities, and fixed debt payments. CIPOLLA acknowledges that information about

the EIDL applicants' business expenses and employees, and how the EIDL would be used, was material to the SBA's approval, terms, and funding of EIDL loans.

Between April 3, 2020, and June 2, 2020, CIPOLLA, for the purpose of fraudulently obtaining PPP and EIDL funds, submitted and caused to be submitted numerous applications for loans and advances under the PPP and EIDL Programs, on behalf of businesses and entities that CIPOLLA owned and operated (or which were owned and operated by a CIPOLLA associate), which applications contained materially false representations concerning, among other things, the entities' purported employees, revenue and payroll. Specifically, CIPOLLA prepared, and submitted to the SBA, lenders and loan processing companies, applications and supporting documents for three PPP loans and one EIDL, as follows:

EIDL (Six North Aviation): On or about April 3, 2020, CIPOLLA caused to be submitted to the SBA an application for an EIDL on behalf of Six North Aviation. In the EIDL loan application, CIPOLLA falsely represented that, in the 12 months prior to January 31, 2020, Six North Aviation had $3,000,000 in gross revenues and $2,700,000 in cost of goods sold, and that, as of January 31, 2020, the company had four employees. CIPOLLA knew at the time that Six North Aviation did not have the revenue, cost of goods sold, or number of employees that CIPOLLA claimed in the EIDL application. Nonetheless, based upon his false statements in the EIDL application, CIPOLLA caused the SBA to disburse at least approximately $149,900 in EIDL loans and advances

to Six North Aviation. CIPOLLA knew at the time that neither he nor Six North Aviation was entitled to the EIDL funds. CIPOLLA thereafter spent the EIDL proceeds in a manner not authorized by the EIDL Program, including to purchase goods and services for his personal use and benefit.

PPP Loan (Six North Aviation): On or about April 9, 2020, CIPOLLA, on behalf of Six North Aviation, submitted to Bank A an application for a PPP loan from Bank A to Six North Aviation in the amount of approximately $450,000. CIPOLLA submitted the application to Bank A electronically from his residence in Itasca, Illinois, and the application was processed by Bank A servers outside of the State of Illinois. In the application, CIPOLLA falsely claimed that Six North Aviation had an average monthly payroll of $180,000. Bank A initially rejected the PPP loan application.

In an effort to induce Bank A to reconsider its denial of the application, CIPOLLA submitted to Bank A additional false information about Six North Aviation's financial condition, including the following: (a) a document purporting to be a 2019 IRS Form 941 (Employer's Quarterly Tax Return) for Six North Aviation, which falsely reported that, during one quarter in 2019, Six North Aviation made wage payments of approximately $341,034.56 for 17 employees and withheld approximately $21,323.45 in federal income tax; (b) a document purporting to be a "preview copy" of a 2019 IRS Form 1040 individual income tax return for CIPOLLA, which falsely claimed (on Schedule

C) that Six North Aviation paid wages of approximately $1,249,999 in 2019; and (c) documents purporting to be employee profiles for 18 purported Six North Aviation employees, most of which contained false social security numbers and/or false addresses for the purported employees. As CIPOLLA knew at the time, he had not filed a federal individual income tax return in 2019 and Six North Aviation had few or no employees, did not withhold income taxes from employee pay, had not paid any withholding to the IRS and did not pay wages of $1,249,999 to employees in 2019.

As a result of receiving these false supporting documents, Bank A reconsidered the Six North Aviation PPP loan application and approved the disbursal of a PPP loan to Six North Aviation in the amount of approximately $284,195. The proceeds of the PPP loan were transferred to a Six North Aviation bank account, which CIPOLLA controlled, on or about May 1, 2020. CIPOLLA knew at the time that neither he nor Six North Aviation was entitled to the PPP loan funds. CIPOLLA thereafter spent the loan proceeds in a manner not authorized by the PPP loan program, including to purchase goods and services for his personal use and benefit.

PPP Loan (Exotic Aerospace): On or about May 1, 2020, CIPOLLA caused to be submitted to Company D an application for a PPP loan from BankB to Exotic Aerospace in the amount of approximately $305,000. Exotic Aerospace was nominally owned and operated by a CIPOLLA associate,

Individual AP. The PPP loan application falsely and fraudulently represented that Exotic Aerospace had 17 employees and a monthly average payroll of $122,000; however, as CIPOLLA knew at the time he caused the submission of the application, Exotic Aerospace did not have 17 employees or a monthly payroll of $122,000. In addition, as further support of the PPP loan application, CIPOLLA caused to be submitted to Company D and Bank B a document purporting to be a 2019 IRS Form 941 for Exotic Aerospace, which falsely reported that, during the fourth quarter of 2019, Exotic Aerospace made wage payments of approximately $407,923.23 for 17 employees and withheld approximately $57,878 in federal income tax. CIPOLLA knew at the time that Exotic Aerospace had few or no employees, did not withhold income taxes from employee pay, had not paid any withholding to the IRS and did not pay wages of $407,923.23 to employees in 2019.

On or about May 4, 2020, as a result of the false statements in the PPP loan application and the supporting documentation, Bank B issued a PPP loan to Exotic Aerospace in the amount of approximately $305,000 and deposited the loan proceeds into an Exotic Aerospace bank account. Individual AP then directed a share of the PPP loan proceeds to CIPOLLA. CIPOLLA knew at the time that neither he nor Individual AP nor Exotic Aerospace was entitled to the PPP loan funds. CIPOLLA thereafter spent a large portion of the loan

proceeds in a manner that was not authorized by the PPP program, including to purchase goods and services for his personal use and benefit.

PPP Loan (Chicago Exotic Car Collection): On or about May 30, 2020, CIPOLLA, on behalf of Chicago Exotic Car Collection, caused to be submitted to Company E an application for a PPP loan from Company E to Chicago Exotic Car Collection in the amount of approximately $445,403. The application falsely claimed that Chicago Exotic Car Collection had an average monthly payroll of $178,162 for 24 employees. At the time he submitted the application, CIPOLLA knew that Chicago Exotic Car Collection had few or no employees and did not have a monthly payroll expense of $178,162. In further support of the PPP loan application, CIPOLLA caused to be submitted to Company E a document purporting to be a 2019 IRS Form W-3SS, which falsely reported approximately $534,484 in paid wages and approximately $72,347 in withheld income taxes, as well as a false indication that Chicago Exotic Car Collection had issued 21 IRS Form W-2 wage and tax statements in 2019. CIPOLLA knew at the time that Chicago Exotic Car Collection had not paid wages of $534,484, did not have 21 employees, had not withheld taxes from employee pay and had not paid withheld income taxes to the IRS.

On or about June 2, 2020, as a result of the false statements in the PPP loan application and the supporting documentation, Company E issued a PPP loan to Chicago Exotic Car Collection in the amount of approximately $445,403

and deposited the loan proceeds into a personal bank account maintained by CIPOLLA. CIPOLLA knew at the time that neither he nor Chicago Exotic Car Collection was entitled to the PPP loan funds. CIPOLLA thereafter spent a large portion of the loan proceeds in a manner that was not authorized by the PPP program, including to purchase goods and services for his personal use and benefit.

Through the submission of the false and fraudulent PPP and EIDL loan applications, and as summarized in the below table, CIPOLLA caused the SBA, lenders and loan processing companies to disburse approximately $1,184,498 in PPP and EIDL loan proceeds and advances into bank accounts that either he or Individual AP controlled, and he attempted to fraudulently obtain an additional $165,805 in PPP proceeds, for a total intended loss of $1,350,303:

| Loan Type | Borrowing Entity | Lender | Amount Sought | Amount Received |
|-----------|------------------|--------|---------------|-----------------|
| EIDL | Six North Aviation | SBA | $149,900 | $149,900 |
| PPP | Six North Aviation | Bank A | $450,000 | $284,195 |
| PPP | Exotic Aerospace | Bank B | $305,000 | $305,000 |
| PPP | Chicago Exotic Car Collection | Company E | $445,403 | $445,403 |

| | | |
|---|---|---|
| TOTALS: | $1,350,303 | $1,184,498 |

CIPOLLA has not repaid any of the PPP loan and EIDL proceeds he obtained during the course of the PPP/EIDL fraud scheme.

      c.     With respect to Count 22 of the superseding indictment:

Beginning no earlier than in or about 2016, and continuing until at least in or about 2020, in the Northern District of Illinois, Eastern Division, and elsewhere, CIPOLLA knowingly devised, intended to devise, and participated in a scheme to defraud, and to obtain money and property from Individual BM, Company G, and other individuals and entities, by means of materially false and fraudulent pretenses, representations, and promises; and on or about June 28, 2019, for the purpose of executing the scheme, and attempting to do so, CIPOLLA knowingly placed and caused to be placed in an authorized depository for mail an item to be delivered by the United States Postal Service, namely, an Illinois Certificate of Title of a Vehicle for a 1986 Buick Regal Grand National (VIN ending 1876) addressed to Company G in North Royalton, Ohio, in violation of Title 18, United States Code, Section 1341.

Specifically, at various times between 2016 and 2020, CIPOLLA sold motor vehicles and aircraft to various individuals by falsely representing the condition of the vehicles and aircraft, thereby increasing the vehicles' ostensible value; and by fraudulently promising to deliver vehicles that he neither possessed nor intended to deliver.

During this time, CIPOLLA owned, operated and controlled various companies, including Chicago Muscle Cars, Mercedes Benz Classics and Six North Aviation, through which he purchased and resold motor vehicles for a profit. Through Six North Aviation, CIPOLLA purchased and resold aircraft for profit. After purchasing such vehicles and aircraft, CIPOLLA sometimes performed maintenance on the vehicles and aircraft. CIPOLLA then used online sites, including eBay, Craigslist and Trade-A-Plane to offer such vehicles and aircraft for sale. The seller was usually listed as a company owned and controlled by CIPOLLA.

On various occasions, CIPOLLA made false statements and representations to prospective purchasers about the condition of vehicles and aircraft that he offered for sale on the internet sites. CIPOLLA made these false statements to induce the prospective purchasers to conclude that the vehicle or aircraft for sale was worth more than it actually was worth, and therefore pay more for the vehicle or aircraft than its actual worth. In addition, CIPOLLA sometimes advertised for sale vehicles that he did not possess or that he did not intend to deliver after receiving the purchase money from a buyer. At times, CIPOLLA also manually rolled back, or caused to be rolled back, the mileage on vehicle odometers in order to increase the apparent value of the vehicle and thereafter falsely represented to prospective purchasers that the rolled back mileage was the vehicle's true mileage.

CIPOLLA acknowledges that the individuals and entities that purchased vehicles and aircraft from him and his companies were influenced by his false

statements and representations, both in their decision to purchase the vehicle or aircraft and in determining the value of the vehicle or aircraft. On occasion, individuals who purchased a vehicle or aircraft from CIPOLLA learned of CIPOLLA's false representations about the condition of the vehicle or aircraft after paying CIPOLLA the purchase money and taking possession of the vehicle or aircraft. As part of the scheme, on various occasions, CIPOLLA accepted purchase money for a vehicle or aircraft but thereafter refused to return all or a portion of the purchase money despite his failure to provide the purchaser with the vehicle or aircraft.

For example, in or about April 2017, CIPOLLA, through Mercedes Benz Classics, advertised for sale a 1987 Mercedes Benz 560 SL (Vehicle Identification Number ("VIN") ending 1470) for sale on eBay. Individual BM saw the description of the vehicle on eBay and contacted CIPOLLA, who represented to Individual BM that CIPOLLA had the vehicle and was willing to sell it to Individual BM. Following negotiation, Individual BM agreed to purchase the vehicle for $16,000. Prior to receiving the vehicle, Individual BM paid $16,000 to Mercedes Benz Classics as purchase money for the vehicle. However, after receiving the purchase money from Individual BM, CIPOLLA neither provided Individual BM with the vehicle nor refunded the purchase money to Individual BM.

In or about May or June 2019, CIPOLLA purchased a 1986 Buick Regal Grand National (VIN ending 1876) from an individual in Michigan and caused the vehicle to be titled in Illinois under Six North Aviation. After obtaining the vehicle, with the

intent to fraudulently increase the vehicle's value, CIPOLLA rolled back the vehicle's odometer from an approximate high mileage of 55,728 to an approximate low mileage of 4,800. In or about June 2019, after rolling back the odometer, CIPOLLA, through Six North Aviation, advertised the vehicle for sale on eBay. Representatives of Company G, which is a classic car dealer in North Royalton, Ohio, saw the vehicle on eBay and contacted CIPOLLA for more information. In or about June 2019, in a phone conversation with representatives of Company G, CIPOLLA misrepresented the true condition of the vehicle, including by falsely asserting that the vehicle's mileage was only approximately 4,800. As a result of CIPOLLA's false representations concerning the vehicle, including those related to the false claim that the odometer was only at 4,800 miles, CIPOLLA induced Company G, on or about June 18, 2019, to pay Six North Aviation $27,500 for the vehicle. On or about June 28, 2019, CIPOLLA knowingly placed and caused to be placed in the mail, for delivery by the United States Postal Service to Company G in North Royalton, the Illinois Certificate of Title for the 1986 Buick Regal Grand National (VIN ending 1876).

CIPOLLA acknowledges that the total actual losses caused by his false and fraudulent sale of vehicles and aircraft was at least approximately $301,699.

   d.    With respect to Count 24 of the superseding indictment:

Beginning no earlier than on or about October 6, 2020, and continuing until at least May 9, 2021, at DuPage County, in the Northern District of Illinois, Eastern Division, and elsewhere, CIPOLLA knowingly devised, intended to devise, and

participated in a scheme to defraud, and to obtain money and property from Individual JM and Company H, by means of materially false and fraudulent pretenses, representations, and promises, and the concealment of material facts; and on or about April 24, 2021, for the purpose of executing the scheme, CIPOLLA knowingly caused to be transmitted by means of wire communications in interstate commerce certain writings, signs, and signals, namely, a wire transfer of approximately $90,000 from Company H to a bank account (ending in 7682) that CIPOLLA maintained at First Midwest Bank in the Northern District of Illinois, which wire transfer originated outside the State of Illinois, in violation of Title 18, United States Code, Section 1343.

In particular, CIPOLLA used Six North Aviation, Chicago Exotic Car Collection and Dupage Aviation in order to obtain access to private jet aircraft, including both (a) a Dassault-Breguet Falcon 50 aircraft bearing Federal Aviation Administration ("FAA") Registration Number N569BW ("the Falcon 50 Aircraft"), which was leased by Chicago Exotic Car Collection from its owner during the period of approximately June 16, 2020, through and including December 2, 2020; and (b) a British Aerospace BAE 125 Series 800A Hawker aircraft bearing FAA Registration Number N117JT ("the Hawker 800 Aircraft"), which was owned by Dupage Aviation as of approximately August 24, 2020. CIPOLLA maintained the Falcon 50 Aircraft and the Hawker 800 Aircraft at various places, including at the DuPage Airport in West Chicago, Illinois.

During the period of the scheme, CIPOLLA advertised on an internet site that consumers could dry lease aircraft, including the Falcon 50 Aircraft and the Hawker 800 Aircraft, from Dupage Aviation, meaning that consumers could rent the aircraft without the provision of a pilot or crew, with additional expenses to be borne by the lessee of the aircraft. In the website posting, CIPOLLA falsely represented that Dupage Aviation owned the Falcon 50 Aircraft. Through the use of false representations and promises, including the false claim that the Falcon 50 Aircraft and the Hawker 800 Aircraft were insured, CIPOLLA induced Individual JM and Company H to separately enter into contracts with Dupage Aviation for the provision of dry leasing services.

On or about October 6, 2020, CIPOLLA, acting on behalf of Dupage Aviation, as lessor, entered into a non-exclusive dry lease contract with Individual JM, as lessee, for a number of flight hours on the Hawker 800 Aircraft. In the standard dry lease contract that CIPOLLA used for the contract between Dupage Aviation and Individual JM, CIPOLLA falsely claimed that: (a) the lessor maintained an insurance policy with the "N. Brown Agency" in the amount of $1,000,000 that would insure the lessee's contractual liability to the lessor, including as a result of damage or loss of the aircraft as a result of the lessee's operation of the leased aircraft; and (b) that the lessor would provide the lessee with a copy of the Certificate of Insurance upon demand. In fact, CIPOLLA did not maintain an insurance policy on the Hawker 800

Aircraft. The existence of the claimed insurance policy was a material factor in the lessee's decision to lease the aircraft.

CIPOLLA also falsely represented to Individual JM that Individual JM could, at his election, use the leased flight hours interchangeably between the Falcon 50 Aircraft and the Hawker 800 Aircraft. As a result of CIPOLLA's false representations, Individual JM paid $30,000 to Dupage Aviation to dry lease the Hawker 800 Aircraft and/or the Falcon 50 Aircraft. At CIPOLLA's direction, the funds were wired into a Six North Aviation bank account. Later, in or about January 2021, when Individual JM requested use of the Falcon 50 aircraft, CIPOLLA falsely represented to Individual JM that the Falcon 50 Aircraft was unavailable due to repairs when, as CIPOLLA knew, it was unavailable to CIPOLLA because the owner of the Falcon 50 Aircraft had repossessed it from Dupage Aviation on or about December 2, 2020.

On or about April 25, 2021, CIPOLLA, acting on behalf of Dupage Aviation, as lessor, entered into a non-exclusive dry lease contract with Company H, for a number of flight hours on the Hawker 800 Aircraft. In the standard dry lease contract that CIPOLLA used for the contract between Dupage Aviation and Company H, CIPOLLA falsely claimed that: (a) the lessor maintained an insurance policy with the "N. Brown Agency" in the amount of $1,000,000 that would insure the lessee's contractual liability to the lessor, including as a result of damage or loss of the aircraft as a result of the lessee's operation of the leased aircraft; and (b) that the lessor would provide the lessee with a copy of the Certificate of Insurance upon demand. The dry lease

21

contract further stated that this insurance policy included a $50,000,000 per incident aggregate policy that named Company H as an additional insured.

In fact, CIPOLLA did not maintain an insurance policy on the aircraft. The existence of the claimed insurance policy was a material factor in the lessee's decision to lease the aircraft. Further, during the course of negotiating the lease and well into the lease period, CIPOLLA falsely represented to an official of Company H that his name was "Joe Cunningham." As a result of CIPOLLA's false representations, Company H paid $90,000 to Dupage Aviation to dry lease the Hawker 800 Aircraft via a wire transfer into a personal bank account held by CIPOLLA.

CIPOLLA acknowledges that the total actual losses caused by his false and fraudulent leasing of private jet aircraft was at least approximately $120,000.

### Maximum Statutory Penalties

7.    Defendant understands that the charges to which he is pleading guilty carry the following statutory penalties:

a.    Count 11 carries a maximum sentence of 5 years' imprisonment. Count 11 also carries a maximum fine of $250,000, or twice the gross gain or gross loss resulting from that offense, whichever is greater. Defendant further understands that the Court must order costs of prosecution, estimated not to exceed $500. Defendant further understands that with respect to Count 11 the judge also may impose a term of supervised release of not more than three years.

b. Count 13 carries a maximum sentence of 20 years' imprisonment. Count 13 also carries a maximum fine of $250,000, or twice the gross gain or gross loss resulting from that offense, whichever is greater. Defendant further understands that with respect to Count 13, the judge also may impose a term of supervised release of not more than three years.

c. Count 22 carries a maximum sentence of 20 years' imprisonment. Count 22 also carries a maximum fine of $250,000, or twice the gross gain or gross loss resulting from that offense, whichever is greater. Defendant further understands that with respect to Count 21 the judge also may impose a term of supervised release of not more than three years.

d. Count 24 carries a maximum sentence of 20 years' imprisonment. Count 21 also carries a maximum fine of $250,000, or twice the gross gain or gross loss resulting from that offense, whichever is greater. Defendant further understands that with respect to Count 21 the judge also may impose a term of supervised release of not more than three years.

e. Defendant further understands that the Court must order restitution to the victims of the offense in an amount determined by the Court. The Court also may order restitution to any persons as agreed by the parties.

f. Pursuant to Title 18, United States Code, Section 3013, defendant will be assessed $100 on each count to which he has pled guilty, in addition to any other penalty or restitution imposed.

g. Therefore, under the counts to which defendant is pleading guilty, the total maximum sentence is 65 years' imprisonment. In addition, defendant is subject to a total maximum fine of $1,000,000, or twice the gross gain or gross loss resulting from the offenses of conviction, whichever is greater, mandatory costs of prosecution, a period of supervised release, and special assessments totaling $400, in addition to any restitution ordered by the Court.

## Sentencing Guidelines Calculations

8. Defendant understands that, in determining a sentence, the Court is obligated to calculate the applicable Sentencing Guidelines range, and to consider that range, possible departures under the Sentencing Guidelines, and other sentencing factors under 18 U.S.C. § 3553(a), which include: (i) the nature and circumstances of the offense and the history and characteristics of the defendant; (ii) the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence to criminal conduct, protect the public from further crimes of the defendant, and provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (iii) the kinds of sentences available; (iv) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (v) the need to provide restitution to any victim of the offense.

9. For purposes of calculating the Sentencing Guidelines, the parties agree on the following points:

a. **Applicable Guidelines**. The Sentencing Guidelines to be considered in this case are those in effect at the time of sentencing. The following statements regarding the calculation of the Sentencing Guidelines are based on the Guidelines Manual currently in effect, namely the 2021 Guidelines Manual.

b. **Offense Level Calculations**.

<u>Count 11 – Tax Evasion</u>

i. Pursuant to Guideline §§ 2T1.1(a)(1) and 2T4.1(G), the base offense level is 18 because the tax loss was more than $250,000 but less than $550,000.

ii. Pursuant to Guideline § 2T1.1(b)(1), a two-level increase is appropriate because defendant failed to report and to correctly identify the source of income exceeding $10,000 in any year from criminal activity.

iii. Based upon the foregoing, the offense level for Count 11, prior to application of Chapter 3D of the United States Sentencing Guidelines, is 20.

<u>Counts 13, 22 and 24 (Wire Fraud and Mail Fraud)</u>

iv. Pursuant to Guideline § 3D1.2(d), Counts 13, 22 and 24 form one Group (the "Fraud Group") because the offense level for each of these counts is determined largely on the basis of the total amount of loss under Guideline § 2B1.1. Pursuant to Guideline § 3D1.3(b), the offense level applicable to the Fraud

Group is the offense level corresponding to the aggregated quantity, determined in accordance with Chapter Two and Parts A, B, and C of Chapter Three of the Sentencing Guidelines. The adjusted offense level for the Fraud Group under Chapter 2 and Parts A, B, and C of Chapter Three of the Sentencing Guidelines is 25, based upon the following:

        A.      Pursuant to Guideline § 2B1.1(a)(1), the base offense level is 7.

        B.      The offense level of the Fraud Group is increased by 16 levels pursuant to Guideline § 2B1.1(b)(1)(I) because the amount of loss for which defendant is accountable is approximately $1,772,002 (including approximately $1,350,303 from Count 13, $301,699 from Count 22, and $120,000 from Count 24), which is more than $1,500,000 but not more than $3,500,000.

        C.      The offense level of the Fraud Group is increased by 2 levels, pursuant to Guideline § 2B1.1(b)(2)(A), because the offense (Count 22) involved more than 10 victims.

<u>Combined Offense Level</u>

        v.      The government's position is that, pursuant to Guideline § 3D1.2, Count 11 does not group with the offenses in the Fraud Group.

        vi.      The government's position is that, pursuant to Guideline § 3D1.4, the combined offense level is determined by taking the offense level

applicable to the group with the highest offense level (namely, 25, from the Fraud Group) and increasing that offense level by the number of levels corresponding with the total number of Units formed by all Groups. Pursuant to Guideline § 3D1.4(a), the Fraud Group constitutes one Unit. Pursuant to Guideline § 3D1.4(b), the Count 11 Group constitutes one Unit because its offense level is 20, which is 5 to 8 levels less serious than the group with the highest offense level (the Fraud Group). Accordingly, the total number of Units formed by all Groups is 1.5 and, pursuant to Guideline § 3D1.4, the offense level applicable to the group with the highest offense level (25, from the Fraud Group) is increased by 1 level. Therefore, the total offense level, prior to any adjustment for acceptance of responsibility, is 26.

vii.    The defendant's position is that Count 11 (governed by Guideline § 2T1.1) and the Fraud Group (governed by Guideline § 2B1.1) should form a single group pursuant to Guideline § 3D1.2(c) and (d). The loss amount for the grouped offenses is $2,212,090, comprised of the tax loss of $490,088 for Count 11 and $1,722,002 for the Fraud Group. Guideline § 2B1.1 should be applied to this combined group. Application of Guideline § 2B1.1 to this combined group results yields an adjusted offense level of 25 (calculated in the same manner as the offense level for the Fraud Group) prior to consideration of a reduction for acceptance of responsibility under Guideline § 3E1.1.

<u>Acceptance of Responsibility</u>

      viii.      Defendant has clearly demonstrated a recognition and affirmative acceptance of personal responsibility for his criminal conduct. If the government does not receive additional evidence in conflict with this provision, and if defendant continues to accept responsibility for his actions within the meaning of Guideline § 3E1.1(a), including by furnishing the United States Attorney's Office and the Probation Office with all requested financial information relevant to his ability to satisfy any fine or restitution that may be imposed in this case, a two-level reduction in the offense level is appropriate.

      ix.      In accord with Guideline § 3E1.1(b), defendant has timely notified the government of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the Court to allocate its resources efficiently. Therefore, as provided by Guideline § 3E1.1(b), if the Court determines the offense level to be 16 or greater prior to determining that defendant is entitled to a two-level reduction for acceptance of responsibility, the government will move for an additional one-level reduction in the offense level.

      c.      **Criminal History Category**. With regard to determining defendant's criminal history points and criminal history category, based on the facts now known to the government and stipulated below, the government's position is that defendant's criminal history points equal 33 and defendant's criminal history category is VI:

i. On or about November 8, 2005, defendant was convicted in the Circuit Court of Cook County of two felony theft offenses and sentenced to 18 months' probation. Pursuant to Guideline § 4A1.2(e) this conviction is not assigned any criminal history points.

ii. On or about August 14, 2007, defendant was convicted in Michigan State Court of a felony fraud offense (Kent County) and sentenced to 20 months' imprisonment in the Michigan Department of Corrections ("MDOC"). Pursuant to Guideline § 4A1.1(a), this conviction is assigned three criminal history points.

iii. On or about August 15, 2007, defendant was convicted in Michigan State Court of a felony fraud offense and sentenced to 23 months' imprisonment in MDOC. Pursuant to Guideline § 4A1.1(a), this conviction is assigned three criminal history points.

iv. On or about September 17, 2007, defendant was convicted in Michigan State Court of a felony fraud offense (Ottawa County) and sentenced to 17 months' imprisonment in MDOC. This conviction should be counted with the conviction in Paragraph 9(c)(ii) above and, therefore, pursuant to Guideline § 4A1.2(a)(2), this conviction is not assigned any criminal history points.

v. On or about March 19, 2008, defendant was convicted in the Circuit Court of Will County (Case No. 2006 CF 001832) of felony theft by deception and sentenced to two years' imprisonment in the Illinois Department of

Corrections ("IDOC"). Pursuant to Guideline § 4A1.1(a), this conviction is assigned three criminal history points.

   vi.  On or about March 19, 2008, defendant was convicted in the Circuit Court of Will County (Case No. 2007 CF 000144) of felony theft by deception and sentenced to two years' imprisonment in IDOC. Pursuant to Guideline § 4A1.1(a), this conviction is assigned three criminal history points.

   vii.  On or about April 4, 2008, defendant was convicted in the Circuit Court of Cook County of misdemeanor theft and sentenced to three days' imprisonment. Pursuant to Guideline § 4A1.1(c), this conviction is assigned one criminal history point.

   viii.  On or about April 7, 2008, defendant was convicted in the Circuit Court of Cook County of felony theft by deception and sentenced to three years' imprisonment in IDOC. Pursuant to Guideline § 4A1.1(a), this conviction is assigned three criminal history points.

   ix.  On or about April 7, 2008, defendant was convicted in the Circuit Court of Cook County of felony possession of a stolen motor vehicle and sentenced to three years' imprisonment in IDOC. Pursuant to Guideline § 4A1.1(a), this conviction is assigned three criminal history points.

   x.  On or about May 28, 2008, defendant was convicted in the Circuit Court of Kane County of felony possession of a stolen motor vehicle and

sentenced to 48 months' imprisonment in IDOC. Pursuant to Guideline § 4A1.1(a), this conviction is assigned three criminal history points.

xi.     On or about August 7, 2008, defendant was convicted in the Circuit Court of DuPage County of felony possession of a stolen motor vehicle and sentenced to six years' imprisonment in IDOC. Pursuant to Guideline § 4A1.1(a), this conviction is assigned three criminal history points.

xii.    On or about August 22, 2008, defendant was convicted in Minnesota State Court (Fairbault County) of a misdemeanor theft offense and sentenced to 365 days' imprisonment. Pursuant to Guideline § 4A1.1(b), this conviction is assigned two criminal history points.

xiii.   On or about December 10, 2009, defendant was convicted in Indiana State Court (LaPorte County) of felony forgery and sentenced to four years' imprisonment. Pursuant to Guideline § 4A1.1(a), this conviction is assigned three criminal history points.

xiv.    On or about June 14, 2010, defendant was convicted in Michigan State Court (Calhoun County) of a felony theft offense and sentenced to 24 months' probation. Pursuant to Guideline § 4A1.1(c), this conviction is assigned one criminal history point.

xv.     On or about August 27, 2013, defendant was convicted in the Circuit Court of Cook County of misdemeanor reckless conduct and sentenced to

two days' imprisonment. Pursuant to Guideline § 4A1.1(c), this conviction is assigned one criminal history point.

xvi.     On or about January 12, 2017, defendant was convicted in the Circuit Court of Cook County of misdemeanor harassment and sentenced to a conditional discharge. Pursuant to Guideline § 4A1.1(c), this conviction is assigned one criminal history point.

The defendant's position is that prior convictions identified in paragraph 9(c)(ii) through (xiii) above, some of which were imposed concurrently to each other, were for related conduct from the same underlying scheme and, therefore, that counting each conviction separately substantially over-represents defendant's criminal history. The defendant's position is that a downward departure in criminal history category from VI to V is warranted pursuant to Guideline § 4A1.3(b).

d.     **Anticipated Advisory Sentencing Guidelines Range**. Therefore, based on the facts now known to the government, the anticipated offense level is 23 (government's position) or 22 (defendant's position), and that, when combined with the anticipated criminal history category of VI (government's position) or V (defendant's position), the resulting anticipated advisory sentencing guidelines range is 92 to 115 months' imprisonment (government's position) or 77 to 96 months' imprisonment (defendant's position), in addition to any supervised release, fine, and restitution the Court may impose.

e.    Defendant and his attorney and the government acknowledge that the above guidelines calculations are preliminary in nature, and are non-binding predictions upon which neither party is entitled to rely. Defendant understands that further review of the facts or applicable legal principles may lead the government to conclude that different or additional guidelines provisions apply in this case. Defendant understands that the Probation Office will conduct its own investigation and that the Court ultimately determines the facts and law relevant to sentencing, and that the Court's determinations govern the final guideline calculation. Accordingly, the validity of this Agreement is not contingent upon the probation officer's or the Court's concurrence with the above calculations, and defendant shall not have a right to withdraw his plea on the basis of the Court's rejection of these calculations.

10.    Both parties expressly acknowledge that this Agreement is not governed by Fed. R. Crim. P. 11(c)(1)(B), and that errors in applying or interpreting any of the sentencing guidelines may be corrected by either party prior to sentencing. The parties may correct these errors either by stipulation or by a statement to the Probation Office or the Court, setting forth the disagreement regarding the applicable provisions of the guidelines. The validity of this Agreement will not be affected by such corrections, and defendant shall not have a right to withdraw his plea, nor the government the right to vacate this Agreement, on the basis of such corrections.

## Agreements Relating to Sentencing

11.    Each party is free to recommend whatever sentence it deems appropriate.

12.    It is understood by the parties that the sentencing judge is neither a party to nor bound by this Agreement and may impose a sentence up to the maximum penalties as set forth above. Defendant further acknowledges that if the Court does not accept the sentencing recommendation of the parties, defendant will have no right to withdraw his guilty plea.

13.    Regarding restitution, defendant acknowledges that the total amount of restitution owed to the victims of his offense conduct involved in Counts 13, 22 and 24 is $1,606,197, minus any credit for funds repaid prior to sentencing, and that pursuant to Title 18, United States Code, Section 3663A, the Court must order defendant to make full restitution in the amount outstanding at the time of sentencing. Defendant also agrees to pay additional restitution, arising from his tax fraud conduct, of $415,043 to the Internal Revenue Service and $75,045 to the Illinois Department of Revenue, pursuant to Title 18, United States Code, Sections 3663(a)(3) and 3664. Defendant understands that the amount of tax loss as calculated by the Internal Revenue Service may exceed the amount of tax due as calculated for restitution in the criminal case.

14.    Restitution shall be due immediately, and paid pursuant to a schedule to be set by the Court at sentencing. Defendant acknowledges that pursuant to

Title 18, United States Code, Section 3664(k), he is required to notify the Court and the United States Attorney's Office of any material change in economic circumstances that might affect his ability to pay restitution.

15.     Defendant agrees to pay the special assessment of $400 at the time of sentencing with a cashier's check or money order payable to the Clerk of the U.S. District Court.

16.     Defendant agrees that the United States may enforce collection of any fine or restitution imposed in this case pursuant to Title 18, United States Code, Sections 3572, 3613, and 3664(m), notwithstanding any payment schedule set by the Court.

17.     After sentence has been imposed on the counts to which defendant pleads guilty as agreed herein, the government will move to dismiss the remaining counts of the superseding indictment, as well as the indictment as to defendant.

### Forfeiture

18.     Defendant understands that, by pleading guilty, he will subject to forfeiture to the United States all right, title, and interest that he has in any property constituting or derived from proceeds obtained, directly or indirectly, as a result of the offense.

19.     Defendant agrees to the entry of a personal money judgment in the amount of $1,606,197, which represents the total amount of proceeds traceable to the offense. Defendant consents to the immediate entry of a preliminary order of

forfeiture setting forth the amount of the personal money judgment he will be ordered to pay.

20.    Defendant admits that because the directly forfeitable property is no longer available for forfeiture as described in Title 21, United States Code, Section 853(p)(1), the United States is entitled to seek forfeiture of any other property of defendant, up to the value of the personal money judgment, as substitute assets pursuant to Title 21, United States Code, Section 853(p)(2).

21.    Defendant understands that forfeiture shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty the Court may impose upon defendant in addition to the forfeiture judgment. In this case, however, the United States Attorney's Office will recommend to the Attorney General that any net proceeds derived from any forfeited assets be remitted or restored to eligible victims of the offense pursuant to Title 18, United States Code, Section 981(e), Title 28, Code of Federal Regulations, Part 9, and other applicable law.

22.    Defendant agrees to waive and abandon any right, title, or interest he has in the following property: any equity or other interest he has in the residence located at 107 Carmela Court, Bloomingdale, Illinois, 60108. Defendant understands that the government, after publication of notice to others who may have an interest in the property, will seek an order of abandonment from the Court, thereby authorizing the United States to dispose of such property according to law. Defendant

understands that abandonment of this property shall not be treated as satisfaction of any fine, cost of imprisonment, or any other penalty the Court may impose.

23.     Defendant agrees to waive all constitutional, statutory, and equitable challenges in any manner, including but not limited to direct appeal or a motion brought under Title 28, United States Code, Section 2255, to any forfeiture and/or abandonment carried out in accordance with this agreement on any grounds, including that the forfeiture constitutes an excessive fine or punishment. The waiver in this paragraph does not apply to a claim of involuntariness or ineffective assistance of counsel.

## Acknowledgments and Waivers Regarding Plea of Guilty

### Nature of Agreement

24.     This Agreement is entirely voluntary and represents the entire agreement between the United States Attorney and defendant regarding defendant's criminal liability in case 22 CR 208.

25.     This Agreement concerns criminal liability only. Except as expressly set forth in this Agreement, nothing herein shall constitute a limitation, waiver, or release by the United States or any of its agencies of any administrative or judicial civil claim, demand, or cause of action it may have against defendant or any other person or entity. The obligations of this Agreement are limited to the United States Attorney's Office for the Northern District of Illinois and cannot bind any other

federal, state, or local prosecuting, administrative, or regulatory authorities, except as expressly set forth in this Agreement.

26. Defendant understands that nothing in this Agreement shall limit the Internal Revenue Service in its collection of any taxes, interest or penalties from defendant or defendant's partnership or corporations. Defendant understands that the amount of tax as calculated by the IRS may exceed the amount of tax due as calculated for the criminal case.

### Waiver of Rights

27. Defendant understands that, by pleading guilty, he surrenders certain rights, including the following:

a. **Trial rights**. Defendant has the right to persist in a plea of not guilty to the charges against him, and if he does, he would have the right to a public and speedy trial.

i. The trial could be either a jury trial or a trial by the judge sitting without a jury. However, in order that the trial be conducted by the judge sitting without a jury, defendant, the government, and the judge all must agree that the trial be conducted by the judge without a jury.

ii. If the trial is a jury trial, the jury would be composed of twelve citizens from the district, selected at random. Defendant and his attorney would participate in choosing the jury by requesting that the Court remove

prospective jurors for cause where actual bias or other disqualification is shown, or by removing prospective jurors without cause by exercising peremptory challenges.

        iii.      If the trial is a jury trial, the jury would be instructed that defendant is presumed innocent, that the government has the burden of proving defendant guilty beyond a reasonable doubt, and that the jury could not convict him unless, after hearing all the evidence, it was persuaded of his guilt beyond a reasonable doubt and that it was to consider each count of the superseding indictment separately. The jury would have to agree unanimously as to each count before it could return a verdict of guilty or not guilty as to that count.

        iv.      If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all the evidence, and considering each count separately, whether or not the judge was persuaded that the government had established defendant's guilt beyond a reasonable doubt.

        v.      At a trial, whether by a jury or a judge, the government would be required to present its witnesses and other evidence against defendant. Defendant would be able to confront those government witnesses and his attorney would be able to cross-examine them.

        vi.      At a trial, defendant could present witnesses and other evidence in his own behalf. If the witnesses for defendant would not appear voluntarily, he could require their attendance through the subpoena power of the Court. A defendant is not required to present any evidence.

vii.     At a trial, defendant would have a privilege against self-incrimination so that he could decline to testify, and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify in his own behalf.

b.     **Appellate rights.** Defendant further understands he is waiving all appellate issues that might have been available if he had exercised his right to trial, and may only appeal the validity of this plea of guilty and the sentence imposed. Defendant understands that any appeal must be filed within 14 calendar days of the entry of the judgment of conviction.

28.     Defendant understands that, by pleading guilty, he is waiving all the rights set forth in the prior paragraphs, with the exception of the appellate rights specifically preserved above. Defendant's attorney has explained those rights to him, and the consequences of his waiver of those rights.

## Presentence Investigation Report/Post-Sentence Supervision

29.     Defendant understands that the United States Attorney's Office in its submission to the Probation Office as part of the Pre-Sentence Report and at sentencing shall fully apprise the District Court and the Probation Office of the nature, scope, and extent of defendant's conduct regarding the charges against him, and related matters. The government will make known all matters in aggravation and mitigation relevant to sentencing.

30.    Defendant agrees to truthfully and completely execute a Financial Statement (with supporting documentation) prior to sentencing, to be provided to and shared among the Court, the Probation Office, and the United States Attorney's Office regarding all details of his financial circumstances, including his recent income tax returns as specified by the probation officer. Defendant understands that providing false or incomplete information, or refusing to provide this information, may be used as a basis for denial of a reduction for acceptance of responsibility pursuant to Guideline § 3E1.1 and enhancement of his sentence for obstruction of justice under Guideline § 3C1.1, and may be prosecuted as a violation of Title 18, United States Code, Section 1001, or as a contempt of the Court.

31.    For the purpose of monitoring defendant's compliance with his obligations to pay a fine and restitution during any term of supervised release or probation to which defendant is sentenced, defendant further consents to the disclosure by the IRS to the Probation Office and the United States Attorney's Office of defendant's individual income tax returns (together with extensions, correspondence, and other tax information) filed subsequent to defendant's sentencing, to and including the final year of any period of supervised release or probation to which defendant is sentenced. Defendant also agrees that a certified copy of this Agreement shall be sufficient evidence of defendant's request to the IRS to disclose the returns and return information, as provided for in Title 26, United States Code, Section 6103(b).

## Other Terms

32.　Defendant agrees to cooperate with the United States Attorney's Office in collecting any unpaid fine and restitution for which defendant is liable, including providing financial statements and supporting records as requested by the United States Attorney's Office.

33.　Regarding matters relating to the Internal Revenue Service, defendant agrees as follows (nothing in this paragraph, however, precludes defendant or defendant's partnerships, corporations or limited liability companies from asserting any legal or factual defense to taxes, interest, and penalties that may be assessed by the IRS):

　　　a.　Defendant agrees to cooperate with the Internal Revenue Service in any tax examination or audit of defendant and defendant's partnerships or corporations which directly or indirectly relates to or arises out of the course of conduct that defendant has acknowledged in this Agreement, by transmitting to the IRS original records or copies thereof, and any additional books and records that the IRS may request.

34.　Defendant will not object to a motion brought by the United States Attorney's Office for the entry of an order authorizing disclosure of documents, testimony and related investigative materials which may constitute grand jury material, preliminary to or in connection with any judicial proceeding, pursuant to Fed. R. Crim. P. 6(e)(3)(E)(i). In addition, defendant will not object to the

government's solicitation of consent from third parties who provided records or other materials to the grand jury pursuant to grand jury subpoenas, to turn those materials over to the Civil Division of the United States Attorney's Office, or an appropriate federal or state agency (including but not limited to the Internal Revenue Service), for use in civil or administrative proceedings or investigations, rather than returning them to the third parties for later summons or subpoena in connection with a civil or administrative proceeding involving, or investigation of, defendant or defendant's partnerships, corporations and limited liability companies. Nothing in this paragraph or the preceding paragraph precludes defendant or defendant's partnerships, corporations or limited liability companies from asserting any legal or factual defense to taxes, interest, and penalties that may be assessed by the IRS.

35. Defendant understands that, pursuant to Title 12, United States Code, Sections 1785(d) and 1829, his conviction in this case will prohibit him from directly or indirectly participating in the affairs of any financial institution insured by the National Credit Union Share Insurance Fund or the Federal Deposit Insurance Corporation, except with the prior written consent of the National Credit Union Administration Board or the FDIC and, during the ten years following his conviction, the additional approval of this Court. Defendant further understands that if he knowingly violates this prohibition, he may be punished by imprisonment for up to five years, and a fine of up to $1,000,000 for each day the prohibition is violated.

36.     Defendant understands that, if convicted, a defendant who is not a United States citizen may be removed from the United States, denied citizenship, and denied admission to the United States in the future.

## Conclusion

37.     Defendant understands that this Agreement will be filed with the Court, will become a matter of public record, and may be disclosed to any person.

38.     Defendant understands that his compliance with each part of this Agreement extends throughout the period of his sentence, and failure to abide by any term of the Agreement is a violation of the Agreement. Defendant further understands that in the event he violates this Agreement, the government, at its option, may move to vacate the Agreement, rendering it null and void, and thereafter prosecute defendant not subject to any of the limits set forth in this Agreement, or may move to resentence defendant or require defendant's specific performance of this Agreement. Defendant understands and agrees that in the event that the Court permits defendant to withdraw from this Agreement, or defendant breaches any of its terms and the government elects to void the Agreement and prosecute defendant, any prosecutions that are not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against defendant in accordance with this paragraph, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement of such prosecutions.

39. Should the judge refuse to accept defendant's plea of guilty, this Agreement shall become null and void and neither party will be bound to it.

40. Defendant and his attorney acknowledge that no threats, promises, or representations have been made, nor agreements reached, other than those set forth in this Agreement, to cause defendant to plead guilty.

41. Defendant acknowledges that he has read this Agreement and carefully reviewed each provision with his attorney. Defendant further acknowledges that he understands and voluntarily accepts each and every term and condition of this Agreement.

AGREED THIS DATE: __11/22/23__

MORRIS PASQUAL
Acting United States Attorney

JOSEPH J. CIPOLLA, JR.
Defendant

TIMOTHY J. CHAPMAN
Assistant U.S. Attorney

JACK CORFMAN
Attorney for Defendant